## STUART v. SMITH.

### (Circuit Court, S. D. New York. April 16, 1895.)

COPYRIGHT—INFRINGEMENT—INJUNCTION AGAINST OFFICER OF CORPORATION.

In a suit against one S. for an injunction against infringement of a copyright and for an accounting, it appeared that S. was the president and general manager of a corporation, financially responsible, by which, if at all, the infringement had been committed, contrary to the instructions of S., which corporation was not a party to the suit. *Held,* that S. should not alone be held personally responsible for the alleged wrongful acts, merely because he was an officer of the corporation, and that the bill should be dismissed. Linotype Co. v. Ridder, 65 Fed. 853, followed.

This was a suit by Ruth McEnery Stuart against Orlando J. Smith for infringement of a copyright. The cause was heard on the pleadings and proofs.

A. T. Gurlitz, for complainant.

Rowland Cox, for defendant.

TOWNSEND, District Judge. This is a final hearing on a bill alleging infringement of copyright, and praying for an injunction and an accounting. A preliminary injunction was granted November 18, 1893. Two motions to vacate the same have been denied. The complainant is the author of a story originally entitled "Carlotta di Carlo," the title of which was afterwards changed to "Carlotta's Intended." The defendant is the president and general manager of the American Press Association, a corporation which is engaged in furnishing matter in stereotype plate and syndicate form to a large number of newspapers throughout the United States. It is not necessary now to consider the circumstances in which the defendant claims that said press association acquired the right to publish said story, nor the proposed use thereof. Such right, if any, depends upon the construction to be given to a certain contract between the complainant and the J. B. Lippincott Company, which sold said story to said Press Association. The J. B. Lippincott Company is the publisher of Lippincott's Magazine. The complainant first sent her story to the editor of said magazine. Thereupon he called upon her, asked her to enlarge it, so that it might be used as the initial story in his magazine, and agreed to pay her $300 therefor. Afterwards he sent her a check for said sum, and inclosed therewith the following letter and receipt:

"Lippincott's Monthly Magazine.

"Philadelphia, Feb. 27th, 189–.

"Mrs. R. McE. Stuart—Dear Mrs. Stuart: I send herein check for three hundred dollars ($300.00) in accordance with our agreement, which is in payment for the manuscript 'Carlotta di Carlo,' on receipt of which kindly send me receipt as indicated below. We send the manuscript back to you by express, prepaid, for the purpose of your incorporating in it the parts which you said you had previously taken out. In its present shape, I am afraid it will be too short a story for the purpose for which we desire to use it, and if you could add, say a few thousand words, without affecting it disadvantageously, we should like you to do so. The name, of course, you will remember, we have concluded to change, so please suggest some that you think appropriate.

"Yours truly,                                                    J. M. Stoddart."

"New York, March 2d, 1891.

"Received of J. B. Lippincott Company the sum of three hundred dollars ($300), which I acknowledge to be in full payment of all rights, title, and interest, in this country and abroad, of the story of which I am the author, entitled 'Carlotta di Carlo,' the name of the same to be changed hereafter. I hereby agree that the J. B. Lippincott Company may publish this in any form without further recompense to me.          Ruth McEnery Stuart."

The complainant signed and returned the receipt, and the story was copyrighted, and published in said magazine. Afterwards she wrote said editor, asking to recover her copyright, and in response received an assignment thereof to her. Prior to said assignment the Lippincott Company had sold said story to said American Press Association, which prepared plates of said story, printed 6,000 copies of sample sheets thereof, with other stories, under the title of "Novelettes," and offered to sell the plates for publication in installments to its newspaper patrons throughout the United States.

Counsel for defendant claims that the foregoing receipt fairly states the contract between the parties, and that by said contract the Lippincott Company, the assignor of said press association, acquired a perfect title in law and equity to said copyright. Complainant denies that said receipt states the contract between the parties, and claims that when the editor of Lippincott's Magazine called on her it was agreed that she should enlarge said story, and change its title, for the express purpose of having it published as the initial story in one number of said magazine, and for no other purpose; and that for that reason she accepted a much lower price than she would otherwise have done. In view of the conclusions reached, I shall not review at length the evidence upon this point. If it were necessary to the decision of the question, I should incline to hold that the parties have put a practical construction upon the contract by which the assignment was limited, as claimed by complainant. My reasons for this are as follows: The negotiations and correspondence were carried on between complainant and the editor of Lippincott's Magazine, as its editor and manager only. The story was modified for the express purpose of adapting it for publication in said magazine. The repeated assertions by complainant in her letters to said editor that there was no agreement to part with her copyright were not denied by him. The copyright was reassigned to her without consideration, at her request, without mention of its sale, or claim of further right therein. The language of the receipt, prepared by said editor, "I hereby agree that the J. B. Lippincott Company may publish this in any form without further recompense to me," would be mere surplusage if the prior language were intended as an absolute assignment. In these circumstances, in view of this practical construction of the contract by the parties, the receipt may fairly be so interpreted as to harmonize with the claim of complainant as to their original understanding. The testimony of said editor shows affirmatively that he negotiated on behalf of the magazine only, and fails to satisfactorily show that he disclosed any intention to use the article for any other purpose.

The exhaustive briefs of counsel for defendant contain several defenses, only one of which will be considered, as it alone appears to be

fatal to complainant's claim. The answer alleges, and the evidence shows, that said American Press Association, of which the defendant is president, is a corporation. There is no question as to its financial responsibility. It has not been joined as a party defendant in this suit. The evidence shows that the alleged infringing acts were committed by said corporation, contrary to the express instructions of defendant, and without his knowledge, and that the first intimation he had that said story had been published by said corporation was when he was served with the papers in this case. In these circumstances it would be contrary to the well-settled rules of equity to hold this defendant alone personally liable for such wrongful acts, merely because he was an officer of said corporation. Ambler v. Choteau, 107 U. S. 586, 1 Sup. Ct. 556; Howard v. Plow Works, 35 Fed. 743; Cahoone Barnet Manuf'g Co. v. Rubber & Celluloid Harness Co., 45 Fed. 582. This question is considered, and the cases bearing thereon are collected, in Linotype Co. v. Ridder (recently decided by me) 65 Fed. 853. Let the bill be dismissed.